IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DALE BROWN, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) No. 10 C 4556 |
| CON-WAY FREIGHT, INC., | ) ) |
| Defendant. | ) ) ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Dale Brown ("Brown"), a disabled veteran, brought suit against his employer, Con-way Freight, Inc. ("Con-way"), alleging that the company violated the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4301 et seq., when it re-employed him in a lower-paying position following his discharge from the Navy. Now before me is Con-way's motion for summary judgment. For the reasons stated herein, the motion is granted.

I.

The following facts are taken from the parties' Local Rule 56.1 statements, deposition testimony, and exhibits. Unless otherwise noted, these facts are undisputed. Con-way is a nationwide trucking company that conducts business in Illinois. Brown began working for the company in 1987 at Con-way's Des Plaines facility. He now works at the company's Rock Island

facility. Brown had a GED and no other formal education, except for some vocational training and certain military certifications, including as a diesel mechanic and heavy equipment operator. Brown was hired as a driver sales representative ("DSR"), a position he held throughout his tenure with the company until his most recent return from military leave. He never occupied a supervisory position at Con-way.

As a DSR, Brown drove a truck and loaded and unloaded freight. Con-way's position description for the DSR position indicates that frequent lifting of up to 50 pounds and occasional lifting of more than 75 pounds is required. It also requires the driver to "position and connect/disconnect a converter dolly with an average weight/pull force of approximately 128 pounds." The tasks that drivers are called upon to perform require them to frequently reach their arms over their heads, bend, push, pull and twist.[1] *See* Def.'s Mot. for Summ. J., Ex. G.

During much of Brown's employment, he was a Naval Reservist, which required several leaves of absence of varying duration.

---

[1] Brown objects to Con-way's reliance on the position description, arguing it is irrelevant because it is dated March 30, 2009, and therefore was issued after he was reemployed with the company. This objection is not well-taken. Brown brings forth no evidence that the essential tasks of a DSR were different than those detailed in the position description. In fact, his deposition testimony as to his job description is consistent with the position description, except for the times he was on light-duty and performed less strenuous tasks. *See* Brown Dep. at 71:20-73:14.

2

Brown requested, and was granted, about two weeks of leave in August 1999. Con-way again granted him leave in March 2000, April 2001, and August 2002. During his employment, Brown also received at least ten separate leaves of absence for various injuries or surgeries. Con-way assigned Brown temporary, light-duty jobs at least seven times as he recovered from these injuries.

Brown was called to active duty beginning January 9, 2006. His tour was expected to last for almost a year. Under Con-way policy, the company paid Brown differential pay — the difference between his Con-way pay and his military compensation — for the first year of his deployment.

In September 2006, Brown suffered a shoulder injury in a truck accident during a mission in Iraq. After his initial tour, Con-way granted Brown several extensions of his active duty service, as it was required to do by law. On February 20, 2008, Brown underwent a functional capacity evaluation to determine his ability to work. The doctor who examined him concluded that Brown should not lift more than 40 pounds to chest level, should not lift more than 20 pounds overhead, and should avoid work that involves sudden or forceful torquing of his shoulders. The evaluation indicated that work with outstretched arms might be difficult. Def.'s Mot. for Summ. J., Ex. L. These restrictions are permanent, as Brown's condition is not expected to improve.

In December 2008, Brown called Sharon McCurdy in Con-way's Human Resources department and expressed his desire to return to work. McCurdy has since died. Brown contends that he informed McCurdy that his disability prevented him from performing some of the duties of a DSR, and McCurdy told him the company would have to let him go if it did not find an existing position he could fill. Brown then called a military hotline, where he was informed that McCurdy's information was incorrect. Brown called McCurdy back to discuss the relevant provisions of USERRA. According to Brown, McCurdy told him that she had given him wrong information at the behest of "someone way higher up" in the company than she.

By letter dated January 21, 2009, Brown informed Con-way that he had been released from active duty and requested reemployment with the company. In that letter, Brown included a copy of his functional capacity evaluation discussing his physical limitations. Brown wrote: "At this time I will not be able to continue with my former position of truck driver/representative, due to my injury on active duty[.] [H]owever under the provisions of USERRA sec. 4312 and 4313, I am entitled to retraining and/or an equivalent position and equivalent pay." Def.'s Mot. for Summ. J., Ex. M.

The next day, Brown went to the Con-way facility in Rock Island and filled out a re-employment application. On Jan. 27, 2009, Sandra Tapia from Con-way's Human Resources Department called Brown to discuss his physical limitations and determine whether

4

Brown was willing to relocate. During this exchange, Brown expressed an interest in a position as a customer service representative ("CSR"). Brown also expressed an interest in working as a freight operational supervisor ("FOS"), personnel supervisor, or account executive.

By Brown's recollection,[2] there were two FOS positions available at Con-way's Rock Island facility at the time he was seeking reemployment. Brown acknowledged this position would have been a promotion. Jeff Kerbo, Con-way's director of Human Resources, testified that there were no open FOS positions at the Rock Island facility. Kerbo Dep. at 48:18-22. Christopher Meers, who was the service center manager at the Rock Island terminal at the time Brown was seeking re-employment, concurred. Meers testified that the only open positions were DSR positions. Meers Dep. at 56:19-22. Brown contends that he was willing to transfer to another facility, but the record reflects that he told Tapia he was willing to relocate only temporarily, and at Con-way's expense. Pl.'s Resp. to Mot. for Summ. J., Ex. 15.

Brown acknowledges that the company created a CSR position for him. Brown Dep. at 128:15–129:5. Via telephone, Kerbo offered him that position and Brown accepted it, although he acknowledges that he was upset and told Kerbo that accepting a lower-paying position

---

[2] Brown brings forth no evidence that these positions were available outside of his own testimony that they were.

would bankrupt him.  Brown Dep. 121:4-123:9.  According to Brown, Kerbo offered him the position on a "take it or leave it" basis. *Id.* at 122:18-19.  Asked if the position was offered on a "take it or leave it" basis, Kerbo testified that he did not know what was meant by that language, but it is undisputed that the CSR position was the only position offered to Brown.  Kerbo Dep. at 49:22-50:6.

During the conversation with Kerbo, according to Brown, Brown asked Kerbo whether he could obtain an FOS position.  Kerbo replied that "you don't think we're going to give you a promotion."  Brown Dep. at 129: 12-19.  Kerbo, in his deposition testimony, testified that Brown was not qualified for an account executive or FOS position, and added that he had never returned an employee from a leave of absence of any nature and promoted that employee.  Kerbo Dep. at 51: 19-25.  It is undisputed that Kerbo was the final decisionmaker.

Brown returned to work with Con-way on February 9, 2009, as a CSR.  His rate of pay was $18.30 an hour, about five dollars an hour less than what he earned as a DSR.  Brown received the maximum rate of pay for a CSR.  When Brown took the CSR position, his seniority date regarding his pension, vacation accrual and other benefits remained the same.  However, his Job Selection Process ("JSP") seniority date for bidding on shifts was changed to February 9, 2009.

The parties dispute Brown's duties as a CSR. Con-way points to the company's position description and Kerbo's testimony, which described the job as including light shelving, clerical duties, and administrative tasks.[3] *See* Kerbo Dep. at 53:23-24; Def's Mot. for Summ. J., Ex. P. Brown points to paperwork filled out by Jony Pickren, a manager at Con-way, for an unrelated medical leave for Brown in which Pickren indicated that Brown's job included "lifting up to 75 pounds, bending, sitting, computer work." Pl.'s Resp. to Def.'s Mot. for Summ. J., Ex. 14. Pickren was not deposed, and a review of Brown's deposition testimony indicates that he did not testify as to whether his CSR position involves any heavy lifting.

The parties additionally dispute whether Brown was qualified to work as an FOS, account executive, or personnel supervisor. It is undisputed, however, that there were no open personnel supervisor or account representative positions at the time Brown sought to return to work. Brown Dep. at 143:22-144:5. Brown testified that he thought there was an open position as a billing sales representative at that time, but he did not inquire about that position and he could not say who filled it. *Id.* at 145:9-19.

---

[3] Brown again contends that this position description is "irrelevant" because it is dated March 30, 2009, after his reemployment date. Brown fails to develop this argument, and does not offer any contrary evidence, so his objection is not well-taken.

7

Kerbo testified that the FOS position had identical lifting requirements to the DSR because, depending on time constraints, the FOS might have to move freight himself. Kerbo Dep. at 52:12-22. Meers similarly testified that the position required regular lifting of up to 50 pounds and occasional lifting of up to 75 pounds. Meers Dep. at 41:5-19. Brown testified that he performed some of the duties of an FOS while on temporary light-duty assignments for the company, although he acknowledged that the position involved loading and unloading freight. Brown Dep. at 131:4; 132:4-5.

## II.

Summary judgment is appropriate where the record shows that there is no genuine dispute as to an issue of material fact. Fed. R. Civ. P. 56(a). A fact is material if it could affect the outcome of the suit under the governing law, and a dispute is genuine where the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In ruling on summary judgment, courts do not weigh the evidence or determine the truth of the matter, but determine whether a genuine issue of material fact exists that warrants trial. *Id.* at 249. In addressing a motion for summary judgment, courts must review the record in the light most favorable to the non-moving party and draw all reasonable inferences in that party's

favor. *Vanasco v. National-Louis Univ.*, 137 F.3d 962, 965 (7th Cir. 1998). However, a genuine issue of fact is not shown by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The moving party bears the burden of establishing the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party may not rest on mere allegations, but must present specific facts showing that a genuine issue exists for trial. *Big O Tire Dealers, Inc. v. Big O Warehouse*, 741 F.2d 160, 163 (7th Cir. 1984). To support their positions that a genuine issue of material fact does or does not exist, the parties may cite to materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, and interrogatory answers, or show that the materials in the record do or do not establish a genuine dispute. Fed. R. Civ. P. 56(c).

III.

Here, Brown makes two claims: (1) that Con-way violated USERRA when it failed to reasonably accommodate his disability; and (2) that Con-way discriminated against him on the basis of his military service when it refused to promote him to a position that would have been closer to his pay and status as a DSR. Con-way

9

contends that it exceeded its obligations under USERRA and that there is no evidence the company discriminated against Brown on the basis of his military service.

USERRA entitles returning servicemembers to certain reemployment rights in order to ensure that they are not punished for their service. *Milhauser v. Minco Prod., Inc.*, --- F. Supp. 2d ---, 2012 WL 684007, at *5 (D. Minn. 2012). Because USERRA was enacted to protect the rights of servicemembers, it should be broadly construed. *Petty v. Metro. Gov't of Nashville-Davidson Cty.*, 538 F.3d 431, 446 (6th Cir. 2008). However, as the Seventh Circuit has repeatedly held in the context of employment discrimination cases, federal courts do not sit as "superpersonnel departments" to generally oversee a company's employment practice. *Stockwell v. City of Harvey,* 597 F.3d 895, 902 (7th Cir. 2010) (citing *Blise v. Antaramian,* 409 F.3d 861, 867 (7th Cir. 2005)). That principle holds true in cases brought under USERRA. *See Amendola v. Mayo Found. for Med. Educ. and Research*, Nos. 08-6231, 08-6232, 2010 WL 1286087, at *4 (D. Minn. March 29, 2010).

The statute has three functions that are relevant to the instant case: (1) it guarantees veterans a right of reemployment after service, 38 U.S.C. § 4312; (2) it sets forth the positions to which veterans are entitled upon their return, 38 U.S.C. § 4313; and (3) it prevents employers from discriminating against veterans

on account of their service, 38 U.S.C. § 4311. In order to sustain a reemployment claim under §§ 4312 and 4313, a veteran need not prove discrimination on the basis of military service. *Petty*, 538 F.3d at 442–43; *see* 20 C.F.R. § 1002.33 ("The employee is not required to prove that the employer discriminated against him or her because of the employee's uniformed service in order to be eligible for reemployment."). In order to prove a claim under § 4311, however, an employee must prove that he was discriminated against based on his military status. *Id; see* 20 C.F.R. § 1002.22.

Under the statute, if a veteran meets certain prerequisites for reemployment that are not in dispute here, the veteran typically is entitled to be reemployed in the position which he would have occupied if his work had not been interrupted by his service. 38 U.S.C. § 4313(a)(2)(A). This is known as an "escalator position," with the principle being that the servicemember should be placed in a position that:

> reflects with reasonable certainty the pay, benefits, seniority, and other job perquisites, that he or she would have attained if not for the period of service. Depending upon the specific circumstances, the employer may have the option, or be required, to reemploy the employee in a position other than the escalator position.

20 C.F.R. § 1002.191. Different provisions govern, however, when the servicemember is disabled during his service and therefore not qualified to be employed in his "escalator position." In that case, the servicemember must be placed:

11

> (A) in any other position which is equivalent in seniority, status, and pay, the duties of which the person is qualified to perform or would become qualified to perform with reasonable efforts by the employer; or
>
> (B) if not employed under subparagraph (A), in a position which is the nearest approximation to a position referred to in subparagraph (A) in terms of seniority, status, and pay consistent with circumstances of such person's case.

38 U.S.C. § 4313(a)(3)(A),(B). Con-way argues that it is undisputed that Brown was not qualified to perform the essential functions of a DSR, and that no reasonable accommodation existed that would have allowed him to perform those functions. Con-way additionally argues that no equivalent positions were available, so it reemployed Brown in the nearest approximation, which was the CSR position.

### A. Brown's Reemployment Claim

Brown contends, first, that Con-way made no effort to accommodate his disability and restore him to his DSR position. This is an odd argument, given that Brown admitted, from his first communications with Con-way regarding reemployment, that he could not perform the functions of a DSR because he could not do heavy lifting or pushing and pulling. It is undisputed that one of the essential functions of a DSR was to lift freight, and Brown points to no evidence that there was any accommodation that would have allowed him to remain in the DSR position. The real question is whether there is a genuine issue of material fact as to whether Con-way met its responsibility under USERRA to first look for an

equivalent position for which Brown was qualified, or could become qualified with a reasonable accommodation, before placing him in the lower-paying CSR position. *See* 20 C.F.R § 1002.225.

Brown asked to be considered for a position as an FOS, a personnel supervisor, or an account executive. He offers no evidence that these positions were available at the Rock Island terminal at the time he returned from military leave, however, except for the fact that he "thought" there two open FOS positions. I note that in a similar context, in cases brought under the Americans with Disabilities Act, the Seventh Circuit has held that the plaintiff has the burden of showing that a vacant position exists as an accommodation. *McCreary v. Libbey-Owens-Ford Co.*, 132 F.3d 1159, 1165 (7th Cir. 1997). That burden is not met by the plaintiff merely offering his own, conclusory statements that the position exists. *Ozlowski v. Henderson*, 237 F.3d 837, 840 (7th Cir. 2001).

Even if there were FOS positions available, the undisputed evidence is that a FOS must be able to lift freight in the event a driver is not available to do so. Brown Dep. at 130:1-4; Kerbo Dep. at 52:12-22. Brown has brought forth no evidence that he is able to lift heavy freight on a regular basis. He points to the leave form filled out by Pickren, which listed Brown's job functions as including "lifting over 75 pounds." It is not clear how frequently, if at all, Brown is called upon to do heavy

lifting, or whether this statement took into account the lifting accommodation that Con-way contends it provided Brown. Brown's own deposition testimony sheds no light on this issue and provides no reason to believe that Brown is able to exceed the admittedly permanent limitations in his functional capacity assessment.

Brown does not point to any equivalent positions available at the Rock Island terminal that he would have been able to fill given his physical limitations. Nor is his suggestion that he was willing to relocate on a permanent basis well-taken, given that he told Tapia he was willing to relocate only temporarily, and at the company's expense. In light of these facts, Con-way was required to attempt to place Brown in a position that was the nearest approximation to the equivalent position, whether it was higher or lower in pay, seniority, and status. *See* 20 C.F.R. § 1002.225. I note that Con-way's argument that USERRA does not require employers to promote veterans if they are unable to fill an equivalent position is not well-taken. Circumstances could exist where the "nearest approximation" to an equivalent position is in fact a promotion. Brown, however, has not come forward with any evidence of an open position closer to his pay as a DSR that he was physically able to perform.

Consequently, I agree with Con-way that it met or exceeded its obligations under USERRA when it created a position for Brown as a CSR. An employer is not required to reemploy a veteran on his

14

return from service if no position exists that he is capable of performing. 20 C.F.R. § 1002.198; *see Wade v. U.S. Postal Serv.*, 157 F. App'x 268, 270 (5th Cir. 2005). It is understandable that Brown was very disappointed about the reduction in pay that accompanied the CSR position, but there is no evidence supporting his assertion that Con-way "fabricated a tale that they created a unique CSR position for Dale that fits with his limitations." Pl.'s Resp. to Def.'s Mot. for Summ. Judg., 8. In fact, in his deposition, Brown acknowledged that Con-way created the position for him. Brown Dep. 128:15-129:5. For these reasons, Defendant Con-way is entitled to summary judgment on Brown's reemployment claim.

## B. Brown's Failure to Promote Claim

Although Brown's theory of the case is not entirely clear, it appears that he is bringing a separate claim under § 4311 that the company discriminated against him when it failed to promote him to an FOS position. As noted above, in order to prove a claim under this portion of the act, Brown must show that he was discriminated against based on his military status. He bears the initial burden of showing by a preponderance of the evidence that his military service was a substantial or motivating factor in the adverse employment action. *Madden v. Rolls Royce Corp.*, 563 F.3d 636, 638 (7th Cir. 2009). Brown fails to meet this burden.

15

Brown points to an interview done by Con-way's then-Vice President, Dave Miller, with the television news program *60 Minutes*. In that interview, Miller discussed the financial burden that the U.S. military's reliance on members of the National Guard was putting on employers. Miller is quoted as saying:

> If the Department of Defense is going to rely more heavily on [R]eserve and [G]uard, they should take into consideration that all they're doing is shifting costs at that point in time. And there are those that probably won't accept that shifting graciously, at least silently. We won't accept it silently.

Pl.'s Resp. to Def.'s Mot. for Summ. J., Ex. 11, at 4. Brown, however, brings forth no evidence that Miller played any role in determining what position would be offered to Brown following his return from military leave. Kerbo testified that he could not recall any directives from Miller regarding the reemployment rights of veterans or any policy changes stemming from the *60 Minutes* interview. Kerbo Dep. 55:25-56:21. Further, Miller's expression of his concerns regarding government policy on the use of the National Guard does not mean that Con-way intended to (or did) evade its responsibilities under USERRA.

Brown also points to the misinformation that he claims he received from McCurdy in their initial conversation. There is no indication, however, that McCurdy had any role in determining what position Brown would be placed in following his return from military leave. Finally, Brown claims that Kerbo admitted that he

16

refused to promote anyone returning from a *military* leave of absence. In fact, Kerbo's testimony was that he had never returned *anyone* from a leave of absence with a promotion. Kerbo Dep. 51:19-25. As noted above, there are times when USERRA might require a promotion as a reasonable accommodation, but Brown has not met his burden to bring forth evidence that he could perform the essential functions of the FOS position. That aside, there is no evidence that Kerbo, who was undisputably the decisionmaker in this case, was motivated by animus over Brown's military status.

Finally, I note that Brown also argues that Con-way violated USERRA when it made his JSP seniority date Feb. 6, 2009. This date was used to allow employees to bid for shifts. From the record, it appears there was initially confusion as to whether Brown should be allowed to bid for shifts given that JSP date, but Kerbo clarified in a March 4, 2009 email that he was entitled to do so. Pl.'s Resp. to Def.'s Mot. for Summ. J., Ex. 16. The problem for Brown is that he brings forth no evidence that he was harmed in any way by the confusion over his classification. There is no evidence in the record that Brown even attempted to bid for any shifts prior to this issue being resolved. For these reasons, Defendant Con-way is entitled to summary judgment on Brown's claim that he was discriminated against based on his military service.

IV.

For the reasons stated Con-way's motion for summary judgment is granted.

**ENTER ORDER:**

*[signature: Elaine E. Bucklo]*

_____
**Elaine E. Bucklo**
United States District Judge

Dated: May 15, 2012